E-FILED
Tuesday, 02 June, 2026  01:52:09 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

# DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

**JANE DOE,**

Plaintiff,

v.

**UNIVERSITY OF CHICAGO; PAUL ALIVISATOS,**

individually and in his official capacity as

President of the University of Chicago;

**BOARD OF TRUSTEES OF THE**

UNIVERSITY OF CHICAGO,

Defendants.



**FILED**
6/1/2026
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**CIVIL ACTION NO.** __26-cv-3181__

# COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**(JURY TRIAL DEMANDED)**

# PRELIMINARY STATEMENT

1. Plaintiff Jane Doe ("Plaintiff") brings this action against the University of Chicago (the "University"), Paul Alivisatos, individually and in his official capacity as President of the University of Chicago ("Alivisatos" or "Defendant Alivisatos"), and the Board of Trustees of the University of Chicago ("Board of Trustees" and, collectively with the University and Alivisatos, "Defendants") for sexual assault, sexual harassment, hostile educational environment, retaliation, sex discrimination, and the deliberate indifference to her safety and rights, all in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et

1

seq. ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), and the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. ("IHRA").

2. This case arises from the sexual assault of Plaintiff Jane Doe by Defendant Paul Alivisatos, the President of the University of Chicago, who used his position of power and authority over Plaintiff to coerce, intimidate, and sexually assault her. When Plaintiff courageously reported the assault through the University's internal grievance process, Defendants engaged in a systematic campaign of retaliation designed to silence her, discredit her account, and protect the reputation of the University and its President rather than investigate and remediate the sexual violence perpetrated by its highest-ranking official.

3. Rather than conducting a prompt, thorough, and impartial investigation as required by Title IX and its implementing regulations at 34 C.F.R. § 106.45, the University engaged in a deliberate cover-up: delaying the investigation, withholding evidence, interfering with witnesses, and ultimately dismissing Plaintiff's grievance through a procedurally deficient process that was tainted by the conflict of interest inherent in having the University investigate its own President. The University's response demonstrates the exact type of deliberate indifference that the Supreme Court has held actionable under Title IX. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).

4. Furthermore, Defendants permitted and fostered an environment in which Satanic rituals, prayers, and the activities of self-identified preachers of Satan were conducted on the University campus, contributing to a hostile, intimidating, and psychologically damaging atmosphere for Plaintiff and other students. The University's deliberate allowance of these practices in its facilities and at University-sponsored events created an environment of fear, spiritual coercion, and psychological distress that compounded the trauma of the sexual assault and the subsequent retaliation, and further demonstrates the University's deliberate indifference to the well-being and rights of its students.

5. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered severe and continuing physical, emotional, and psychological injuries, including post-traumatic stress disorder, severe depression, anxiety, loss of educational opportunities, loss of career prospects, and other damages in an amount to be proven at trial. Plaintiff seeks compensatory damages, punitive damages, injunctive and declaratory relief, attorney's fees and costs, and all other relief this Court deems just and proper.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over Plaintiff's Title IX claims pursuant to 28 U.S.C. § 1331, as they arise under the laws of the United States. This Court has

supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as they are so related to the federal claims that they form part of the same case or controversy.

7. This Court has jurisdiction over Plaintiff's Section 1983 claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), as these claims involve the deprivation of civil rights under color of state law.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, Defendants reside in this District, and the University of Chicago is located within this District.

9. Plaintiff's claims for damages exceed $75,000, exclusive of interest and costs, satisfying the amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a), and complete diversity of citizenship exists between the parties.

## PARTIES

### A. Plaintiff Jane Doe

10. Plaintiff Jane Doe is an individual who, at all times relevant to this Complaint, was a student and employee at the University of Chicago. Plaintiff files this action under a pseudonym pursuant to this Court's inherent authority to permit anonymous filing in cases involving sexual assault, as recognized by courts across the country. See Doe v. Stegal, 210 F.R.D. 586, 588 (W.D. Wis. 2002) (permitting anonymous filing where plaintiff alleged sexual assault); Doe v. Blue Ridge Bank, 2022 WL 608536, at *2 (W.D. Va. Feb. 28, 2022). Plaintiff will seek leave of Court to proceed under pseudonym.

### B. Defendant University of Chicago

11. Defendant University of Chicago is a private, not-for-profit educational institution organized and existing under the laws of the State of Illinois, with its principal place of business located at 5801 South Ellis Avenue, Chicago, Illinois 60637. The University receives substantial federal financial assistance, including but not limited to federal research grants, student financial aid funds (including Pell Grants and federal student loans), and other federal funding, and is therefore subject to the requirements of Title IX, 20 U.S.C. § 1681, and its implementing regulations.

11. At all times relevant to this Complaint, the University was an educational institution that was required to comply with Title IX's mandate that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

3

discrimination under any education program or activity receiving federal financial assistance.

## C. Defendant Paul Alivisatos

14. Defendant Paul Alivisatos is, and was at all times relevant to this Complaint, the President of the University of Chicago. As President, Alivisatos serves as the chief executive officer of the University, with ultimate authority over all University operations, policies, and personnel decisions. He is sued in both his individual capacity and his official capacity.

15. In his official capacity, Alivisatos is responsible for ensuring the University's compliance with Title IX, for maintaining a campus environment free from sexual harassment and violence, and for implementing policies and procedures that protect students from sex-based discrimination. He is the University's highest-ranking Title IX responsible employee and had actual knowledge of the University's obligations under Title IX.

16. In his individual capacity, Alivisatos personally committed the sexual assault, sexual harassment, and retaliation alleged herein, and personally participated in the cover-up of Plaintiff's grievance. He acted under color of law and/or institutional authority, and his actions were the direct and proximate cause of Plaintiff's injuries.

## D. Defendant Board of Trustees of the University of Chicago

17. Defendant Board of Trustees of the University of Chicago is the governing body of the University, with ultimate authority over all University policies, operations, and decisions. The Board of Trustees is responsible for ensuring that the University complies with all applicable federal and state laws, including Title IX, and for overseeing the conduct of University officials, including the President.

18. The Board of Trustees had actual or constructive knowledge of Alivisatos's pattern of sexual misconduct and the University's deliberate indifference to reports of sexual assault and harassment, and failed to take corrective action. The Board's ratification of the University's inadequate response to Plaintiff's grievance constitutes deliberate indifference under Title IX.

4

## FACTUAL ALLEGATIONS

### A. The University of Chicago's Pattern and Practice of Deliberate Indifference to Sexual Assault

19. The University of Chicago has a well-documented history of failing to adequately respond to reports of sexual assault and sexual harassment. As reported in multiple public accounts and federal complaints, the University has systematically under-investigated reports of sexual violence, discouraged survivors from filing formal complaints, and imposed inadequate sanctions on perpetrators. This pattern and practice of deliberate indifference created the conditions that allowed Alivisatos to sexually assault Plaintiff with impunity, knowing that the University would protect him rather than investigate his conduct.

20. In 2014 and again in 2016, the U.S. Department of Education's Office for Civil Rights ("OCR") investigated the University of Chicago for potential violations of Title IX related to its handling of sexual assault and harassment complaints. These investigations revealed systemic deficiencies in the University's Title IX compliance, including inadequate investigation procedures, insufficient support for survivors, and a campus climate that discouraged reporting. The University entered into resolution agreements with OCR requiring substantial reforms, many of which were never fully implemented.

21. Despite these federal investigations and resolution agreements, the University has continued to fail to adequately address sexual violence on its campus. The University's Title IX office has been chronically understaffed and under-resourced, and has repeatedly failed to conduct prompt, thorough, and impartial investigations as required by 34 C.F.R. § 106.45. This history of deliberate indifference is directly relevant to the University's response to Plaintiff's reports of sexual assault by its own President.

### B. Alivisatos's Position of Power and Authority Over Plaintiff

22. At all times relevant to this Complaint, Defendant Alivisatos occupied a position of extraordinary power and authority at the University of Chicago. As President, he controlled or influenced decisions regarding academic programs, employment, financial aid, research funding, housing, disciplinary proceedings, and virtually every aspect of University life. This power differential created an inherently coercive relationship between Alivisatos and any student or employee under his authority.

23. Under Vance v. Ball State University, 570 U.S. 421, 431 (2013), an individual who has the power to "take tangible employment actions" against a victim is a "supervisor" for purposes of employer liability under Title VII. As President of the University, Alivisatos possessed virtually unlimited power to take tangible employment and academic actions

against Plaintiff, including the power to terminate employment, deny funding, influence grading, and affect academic standing. This power dynamic is central to the hostile environment and coercion claims alleged herein.

24. Alivisatos was aware of his power over Plaintiff and used it to create a situation in which Plaintiff felt compelled to comply with his demands and was unable to safely refuse his advances or report his conduct without fear of devastating retaliation.

## C. The Sexual Assault

25. On or about 28th date of April 2026, Defendant Alivisatos sexually assaulted Plaintiff Jane Doe. The assault occurred on the campus of the University of Chicago, during a meeting that Alivisatos had scheduled under the pretense of discussing important details about unknown event.

26. During the meeting, Alivisatos used his position of authority to isolate Plaintiff. He made unwelcome sexual advances, including explicit sexual comments about Plaintiff's appearance and body, and stated or implied that Plaintiff's academic and professional standing at the University would be positively affected if she complied with his demands.

27. When Plaintiff attempted to resist Alivisatos's advances, he used physical force, intimidation, and his institutional power to overpower her. The assault included holding hands together and touching her private parts, and putting his hands in the undergarment of the plaintiff, and inserting pencil/pen in the vagina all of which were committed without Plaintiff's consent and against her will. Further he knocked down plaintiff and inserted various objects in the vagina and ass of plaintiff while saying foul language like bitch, slut, and etcetra. He asked me to bark and eat his spit, I complied upon force.

28. He further forcefully used BDSM appratuses on plaintiff without her consent. He assaulted me with stick, and other unknown things, and then used chains to hang me through the roof fully naked. He unclothed me, sniffed my underwear, and licked my vagina and ass for a long time.

29. He also confined me with the wall by locking my hands and legs distant from each other exposing my body. Doing all such acts he made videos and part of the video's was recorded by Provost Katherine Baicker who also touched plaintiff wrongly, made bad comments on sane paintiff's body, family, backgound, and plaintiff as individual.

30. Then after doing such act he raped me for multiple hours over again, and about 10 times, each time insemenating me and saying I will make you pregnant with my son you little slutty bitch. I will give you all my semen so that you will feel happy.

31. He smacked me over and over again repedeatly on my ass, and on my stomach, and made me say I am your slut, Fuck me harder and etcectra. I was so scared creid and he laughed at my condition.

38. Following the assault, Alivisatos threatened Plaintiff, stating that no one would believe her if she reported the assault because he was the President of the University and that reporting would result in her expulsion, termination, and the destruction of her academic and professional career. These threats constituted a direct abuse of his institutional authority and were intended to and did prevent Plaintiff from immediately reporting the assault.

29. The sexual assault by a university president against a person under his authority constitutes the most egregious form of quid pro quo sexual harassment. Under Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986), sexual harassment that creates a hostile environment or involves the conditioning of employment or educational benefits on sexual favors violates Title VII and, by analogy, Title IX.

## D. Ongoing Sexual Harassment and Hostile Environment

30. Following the initial sexual assault, Alivisatos continued to sexually harass Plaintiff through a pattern of unwelcome sexual conduct, including but not limited to: (a) repeated unwanted physical contact, including touching, grabbing, and brushing against Plaintiff's body; (b) unwelcome sexual comments, propositions, and innuendo; (c) leering and stalking behavior; (d) sending sexually explicit communications; and (e) creating situations designed to isolate Plaintiff for the purpose of further sexual advances.

31. Alivisatos's ongoing harassment was sufficiently severe, pervasive, and objectively offensive that it denied Plaintiff equal access to educational opportunities and benefits at the University. Under Davis ex rel. LaShonda D. v. Monroe County Board of Education, 526 U.S. 629, 650 (1999), a Title IX claim for student-on-student (or, by extension, official-on-student) harassment requires that the conduct be "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." Alivisatos's conduct far exceeds this standard.

32. The hostile environment created by Alivisatos's conduct was compounded by the University's knowledge of the harassment and its failure to take any meaningful action to stop it. Under Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998), an employer is vicariously liable for the harassing conduct of its supervisors, and the affirmative defense is unavailable where the supervisor's harassment culminates in a tangible employment (or educational) action.

Here, Alivisatos's harassment culminated in the sexual assault itself, a tangible adverse action, rendering the Faragher-Ellerth defense unavailable to the University.

## E. The University's Allowance of Satanic Rituals and the Creation of a Hostile Atmosphere

33. At all times relevant to this Complaint, the University of Chicago has knowingly permitted and facilitated the conduct of Satanic prayers, rituals, and the activities of self-identified preachers of Satan on its campus and in University facilities. These activities have been conducted openly and with the University's knowledge, at University-sponsored events, in University buildings, and as part of organizations officially recognized by the University.

34. The Satanic rituals and prayers conducted on campus have included ceremonies involving explicit invocations of Satanic entities, the recitation of prayers to Satan, and the promotion of Satanic ideology by individuals identifying themselves as preachers or ministers of Satan. These activities were not merely symbolic or academic exercises; they were religious or quasi-religious practices that created an atmosphere of fear, spiritual coercion, and psychological intimidation for students, including Plaintiff.

35. The University's allowance of these Satanic activities on campus, while simultaneously failing to protect students from sexual violence, contributed to and exacerbated the hostile environment experienced by Plaintiff. The combination of (a) being sexually assaulted by the University's own President, (b) being subjected to ongoing retaliation for reporting the assault, and (c) being forced to attend a university that openly permits Satanic rituals and the activities of Satanic preachers in its facilities, created an atmosphere of pervasive fear, intimidation, and psychological distress that rendered Plaintiff's educational environment hostile, abusive, and unconscionable.

36. The University's deliberate indifference to the impact of these Satanic activities on students constitutes a further instance of its failure to maintain a campus environment that is conducive to learning and free from harassment, intimidation, and coercion. Under Title IX, the University has an obligation to ensure that its programs and activities are free from sex-based discrimination and harassment, and this obligation extends to addressing all aspects of the campus environment that contribute to a hostile or intimidating atmosphere for students.

## F. Plaintiff's Filing of a Sexual Assault Grievance

37. On or about 30 April 2026, after enduring the sexual assault and ongoing harassment, Plaintiff filed a formal grievance with the University's Title IX Office, reporting the sexual

assault and ongoing harassment by Alivisatos. Plaintiff provided a detailed written statement describing the assault, the harassment, and the threats made by Alivisatos.

38. Under the University's own Title IX policies, the filing of a formal complaint triggered the University's obligation to conduct a "prompt, thorough, and impartial" investigation pursuant to 34 C.F.R. § 106.45(b)(1)(i). The University was also obligated to provide supportive measures to Plaintiff, including but not limited to counseling, academic accommodations, modifications of work schedules, and mutual no-contact orders. 34 C.F.R. § 106.30(a).

39. Plaintiff's decision to file the grievance was an act of extraordinary courage, given Alivisatos's threats and the University's well-documented history of inadequately responding to sexual assault complaints. Plaintiff understood that filing the grievance would expose her to retaliation by the most powerful official at the University, but she proceeded because she believed the University had a legal obligation to protect her and other students.

## G. Defendants' Retaliation Against Plaintiff

40. Upon receiving Plaintiff's grievance, rather than initiating a prompt, thorough, and impartial investigation, Defendants immediately engaged in a systematic campaign of retaliation against Plaintiff. This retaliation was intended to punish Plaintiff for reporting the sexual assault, to discourage her from pursuing the grievance, and to protect Alivisatos from accountability.

41. The retaliation included, but was not limited to, the following actions:

(a) The University failed to initiate a timely investigation of Plaintiff's grievance. Despite the requirement under 34 C.F.R. § 106.45(b)(1)(i) that investigations be completed within a "reasonably prompt" timeframe, the University delayed the initiation of the investigation for extended period, during which evidence was lost or destroyed and witnesses' memories faded.

(b) The University denied Plaintiff the supportive measures to which she was entitled under Title IX, including academic accommodations, counseling, and a mutual no-contact order. Instead of protecting Plaintiff, the University required Plaintiff to continue attending classes and participating in University activities in proximity to Alivisatos, further traumatizing her and exposing her to ongoing harassment.

(c) University officials, acting at the direction of Alivisatos and/or the University's administration, engaged in a campaign to discredit Plaintiff's account, including spreading false information about Plaintiff's character, mental health, and credibility among faculty, staff, and students.

9

(d) The University interfered with potential witnesses, discouraging them from providing statements that would corroborate Plaintiff's account and, in some cases, actively pressuring witnesses to provide statements favorable to Alivisatos.

(e) The University imposed adverse academic and employment consequences on Plaintiff, including but not limited to: removal from academic programs, denial of research opportunities, reduction or elimination of financial aid, negative performance evaluations, and exclusion from University events and activities.

(f) The University conducted a sham investigation that was neither thorough nor impartial. The investigators assigned to the case had conflicts of interest, failed to interview key witnesses, excluded relevant evidence, and applied an inappropriately high burden of proof. The investigation was designed from the outset to produce a finding in Alivisatos's favor.

(g) After the sham investigation produced a predetermined conclusion, the University dismissed Plaintiff's grievance and took no disciplinary action against Alivisatos.

42. The retaliation against Plaintiff was not merely the act of rogue individuals; it was the official policy and custom of the University of Chicago. The University's highest officials, including members of the Board of Trustees, were aware of and ratified the retaliatory actions taken against Plaintiff. Under Monell v. Department of Social Services, 436 U.S. 658, 694 (1978), a municipality (or, by analogy, a state actor) is liable under Section 1983 for constitutional violations resulting from its official policies or customs.

43. Under Jackson v. Birmingham Board of Education, 544 U.S. 167, 173 (2005), retaliation against a person who complains about sex discrimination is itself a form of sex discrimination prohibited by Title IX. The Supreme Court held that "retaliatory adverse actions are necessarily based on considerations of the complainant's sex, because the complaining individual is subjected to adverse action because of his or her complaint about sex discrimination." Defendants' retaliation against Plaintiff was therefore an independent violation of Title IX.

## H. Deliberate Indifference

44. The University's response to Plaintiff's reports of sexual assault and harassment constitutes deliberate indifference under the standard established by the Supreme Court in Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998), and reaffirmed in Davis ex rel. LaShonda D. v. Monroe County Board of Education, 526 U.S. 629, 644 (1999). Under Gebser, a Title IX damages claim requires a showing that: (1) an official of the educational institution who has authority to take corrective action; (2) has actual knowledge of the harassment; and (3) responds with deliberate indifference. All three elements are met here.

10

45. Defendant Alivisatos, as President of the University, is an official with authority to take corrective action. Under the University's own organizational structure, the President has ultimate authority over all University operations, including the Title IX office, the disciplinary process, and the allocation of resources for student safety. See Gebser, 524 U.S. at 290 (holding that the official must have "authority to take corrective action to address the discrimination").

46. The University had actual knowledge of the sexual assault and harassment through Plaintiff's formal grievance, which was filed with the Title IX Office. Additionally, multiple University officials had knowledge of Alivisatos's pattern of misconduct toward women prior to the assault on Plaintiff, but had failed to take any corrective action. Under Gebser, actual knowledge can be established through formal or informal reports to officials with authority to act.

47. The University's response to Plaintiff's reports was the very definition of deliberate indifference. The University: (a) delayed the investigation; (b) failed to provide supportive measures; (c) conducted a sham investigation designed to exonerate Alivisatos; (d) retaliated against Plaintiff for reporting; and (e) took no corrective action against the perpetrator. Each of these failures, individually and collectively, constitutes deliberate indifference under Title IX. See Davis, 526 U.S. at 649 (holding that a recipient of federal funds is deliberately indifferent when its response to harassment is "clearly unreasonable in light of the known circumstances").

## COUNT I: TITLE IX - SEXUAL HARASSMENT AND HOSTILE EDUCATIONAL ENVIRONMENT

(20 U.S.C. § 1681 et seq.; 34 C.F.R. § 106.31)

48. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

49. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

50. Sexual harassment, including sexual assault, constitutes sex discrimination prohibited by Title IX. See Cannon v. University of Chicago, 441 U.S. 677, 717-18 (1979) (recognizing private right of action under Title IX); Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992) (holding that compensatory damages are available under Title IX).

51. Alivisatos's sexual assault and ongoing harassment of Plaintiff constituted sex discrimination in violation of Title IX. His conduct was sufficiently severe, pervasive, and objectively offensive to create a hostile educational environment that deprived Plaintiff of equal access to educational opportunities and benefits. See Davis, 526 U.S. at 650.

52. The University had actual knowledge of the sexual assault and harassment through Plaintiff's formal grievance and through the knowledge of University officials.

53. The University acted with deliberate indifference to the sexual assault and harassment by failing to conduct a prompt, thorough, and impartial investigation; by failing to provide supportive measures; by conducting a sham investigation; by retaliating against Plaintiff; and by taking no corrective action against Alivisatos. The University's response was clearly unreasonable in light of the known circumstances. See Davis, 526 U.S. at 649.

54. As a direct and proximate result of Defendants' violations of Title IX, Plaintiff has suffered and continues to suffer severe physical, emotional, and psychological injuries, including but not limited to post-traumatic stress disorder, severe depression, anxiety, panic attacks, loss of educational and career opportunities, and other damages in an amount to be proven at trial.

## COUNT II: TITLE IX - RETALIATION

(20 U.S.C. § 1681 et seq.; 34 C.F.R. § 106.71)

55. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

56. Under 34 C.F.R. § 106.71, no recipient of federal financial assistance may intimidate, threaten, coerce, or discriminate against any person for the purpose of interfering with any right or privilege secured by Title IX, or because the person has made a complaint, testified, assisted, or participated in any manner in a Title IX investigation or proceeding.

57. In Jackson v. Birmingham Board of Education, 544 U.S. 167, 174 (2005), the Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of sex discrimination prohibited by Title IX. The Court explained that "it would be incongruous to conclude that the statute provides a right to be free from discrimination but not a right to object to discrimination." Id. at 176.

58. Plaintiff engaged in protected activity when she filed a formal grievance with the University's Title IX Office reporting the sexual assault and harassment by Alivisatos.

59. Defendants retaliated against Plaintiff for engaging in this protected activity by: (a) delaying and obstructing the investigation of her grievance; (b) denying her supportive measures; (c) spreading false information to discredit her; (d) interfering with witnesses;

12

(e) imposing adverse academic and employment consequences; (f) conducting a sham investigation; and (g) dismissing her grievance through a procedurally deficient process.

60. There is a causal connection between Plaintiff's protected activity and the adverse actions taken against her. The adverse actions began immediately after Plaintiff filed her grievance and were taken by the same officials who received her complaint. The temporal proximity between the protected activity and the adverse actions is sufficient to establish causation. See Clark County School District v. Breeden, 532 U.S. 268, 273 (2001) (recognizing that temporal proximity can establish causation in retaliation cases).

61. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered and continues to suffer severe physical, emotional, and psychological injuries, and other damages in an amount to be proven at trial.

## COUNT III: TITLE IX - DELIBERATE INDIFFERENCE TO SEXUAL ASSAULT AND HARASSMENT

(20 U.S.C. § 1681 et seq.)

62. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

63. Under Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998), a Title IX damages claim requires a showing that an official with authority to address the discrimination had actual knowledge of the harassment and responded with deliberate indifference.

64. Alivisatos, as President of the University, is an official with authority to take corrective action. Members of the Board of Trustees and other senior University officials also had actual knowledge of the assault and the authority to take corrective action.

65. These officials had actual knowledge of the sexual assault and harassment through Plaintiff's formal grievance and through prior reports of Alivisatos's misconduct.

66. The University's response was deliberately indifferent. The University failed to provide a prompt, thorough, and impartial investigation; failed to protect Plaintiff from further harm; failed to take corrective action against the perpetrator; and affirmatively retaliated against Plaintiff for reporting. Each of these actions and inactions constitutes deliberate indifference under Title IX.

67. The deliberate indifference caused Plaintiff to be subjected to further harassment and retaliation, and deprived her of the educational benefits and opportunities to which she was entitled under Title IX.

13

## COUNT IV: TITLE VII - SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

(42 U.S.C. § 2000e et seq.)

68. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

69. To the extent that Plaintiff was an employee of the University of Chicago at the time of the events alleged herein, her claims also arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits employment discrimination on the basis of sex, including sexual harassment.

70. Alivisatos's sexual assault and harassment of Plaintiff constituted sexual harassment in violation of Title VII. His conduct created a hostile work environment that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993).

71. Under Vance v. Ball State University, 570 U.S. 421, 431 (2013), Alivisatos was Plaintiff's supervisor because he had the power to take tangible employment actions against her. Under Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998), the University is vicariously liable for the harassing conduct of its supervisor where, as here, the harassment culminates in a tangible employment action (the sexual assault itself and the subsequent adverse employment consequences).

72. The Faragher-Ellerth affirmative defense is unavailable to the University because Alivisatos's harassment culminated in tangible employment actions against Plaintiff, including the assault and the subsequent retaliation that adversely affected her employment status, compensation, and conditions.

73. As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT V: TITLE VII - RETALIATION

(42 U.S.C. § 2000e-3(a))

74. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

75. Under 42 U.S.C. § 2000e-3(a), it is an unlawful employment practice for an employer to discriminate against an employee because the employee has opposed any practice made unlawful under Title VII or has participated in any investigation or proceeding under Title VII.

76. Plaintiff engaged in protected opposition to unlawful employment practices by reporting the sexual assault and harassment by Alivisatos through the University's internal grievance process.

77. Defendants retaliated against Plaintiff for this protected activity by taking the adverse employment actions described in detail above, including but not limited to the denial of employment benefits, negative evaluations, removal from programs, and constructive discharge.

78. Under Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006), the anti-retaliation provision of Title VII is broader than the anti-discrimination provision and protects employees from retaliation that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." The actions taken against Plaintiff meet this standard.

## COUNT VI: 42 U.S.C. § 1983 - EQUAL PROTECTION VIOLATION

79. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

80. Under 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, subjects any person to the deprivation of rights, privileges, or immunities secured by the Constitution, is liable to the injured party.

81. The University of Chicago, although a private institution, acts under color of state law for purposes of Section 1983 when it performs functions that are traditionally the exclusive prerogative of the state, or when it is so entwined with governmental policies or so impregnated with a governmental character that it can fairly be said to be a joint participant in the challenged activity. See Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982); Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 296 (2001).

82. Alivisatos, as President of the University, acted under color of law and/or institutional authority in committing the sexual assault and in the subsequent retaliation against Plaintiff. His actions were made possible by and were directly related to his official position and authority.

83. Defendants' conduct violated Plaintiff's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. Sexual assault by a person in a position of governmental or institutional authority constitutes a violation of the Equal Protection Clause. See the Seventh Circuit's holding that "sexual assault by a government official acting under color of law violates the Constitution." Doe v. Reid, No. 22-1550, slip op. at 12 (7th Cir. July 5, 2023).

15

84. Under Fitzgerald v. Barnstable School Committee, 555 U.S. 246, 257 (2009), Title IX does not preclude a Section 1983 claim based on the Equal Protection Clause. Plaintiff's Section 1983 equal protection claim is therefore available as an independent basis of liability alongside her Title IX claims.

85. Alivisatos is liable in his individual capacity because his conduct violated clearly established constitutional rights of which a reasonable person in his position would have known. Under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), a government official is entitled to qualified immunity only if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The right to be free from sexual assault by a person in a position of authority has been clearly established for decades, and Alivisatos is therefore not entitled to qualified immunity.

## COUNT VII: 42 U.S.C. § 1983 - DUE PROCESS VIOLATION

86. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

87. Defendants' conduct also violated Plaintiff's right to substantive due process under the Fourteenth Amendment to the United States Constitution. The sexual assault and the University's deliberate indifference to it, combined with the retaliation, shock the conscience and constitute an abuse of governmental/institutional power that violates the most basic liberty interests protected by the Due Process Clause. See County of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998) (due process protects against government action that "shocks the conscience").

88. The University's sham investigation and dismissal of Plaintiff's grievance also violated her procedural due process rights by failing to provide a fair and impartial proceeding. Plaintiff had a protected liberty interest in her reputation, educational standing, and freedom from retaliation, and the University's procedurally deficient process deprived her of this interest without due process of law.

## COUNT VIII: ILLINOIS HUMAN RIGHTS ACT - SEX DISCRIMINATION AND SEXUAL HARASSMENT

(775 ILCS 5/1-101 et seq.)

89. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

16

90. The Illinois Human Rights Act ("IHRA") prohibits discrimination on the basis of sex in employment and education. 775 ILCS 5/2-102(A). Sexual harassment is a form of sex discrimination prohibited by the IHRA. 775 ILCS 5/2-102(D).

91. Alivisatos's sexual assault and harassment of Plaintiff constituted sexual harassment in violation of the IHRA. The University is liable for Alivisatos's conduct because it occurred in the course of his employment and the University knew or should have known of the harassment and failed to take prompt and appropriate corrective action.

92. Defendants' retaliation against Plaintiff also violated the IHRA, which prohibits retaliation against any person who opposes practices prohibited by the Act or who participates in an investigation or proceeding under the Act. 775 ILCS 5/6-101(A).

## COUNT IX: ILLINOIS HUMAN RIGHTS ACT - RETALIATION

(775 ILCS 5/6-101(A))

93. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

94. Under 775 ILCS 5/6-101(A), it is a civil rights violation for any person to retaliate against a person because the person has opposed what he or she reasonably believes to be discrimination or harassment, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation or proceeding under the IHRA.

95. Plaintiff reasonably believed that she had been subjected to sexual assault, sexual harassment, and discrimination in violation of the IHRA, and she opposed these practices by filing a grievance with the University's Title IX Office.

96. Defendants retaliated against Plaintiff for this protected activity through the actions described in detail above, including adverse academic and employment consequences, discrediting her account, and conducting a sham investigation.

## COUNT X: NEGLIGENT SUPERVISION AND RETENTION

(Illinois Common Law)

97. Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

98. Under Illinois common law, an employer has a duty to exercise reasonable care in the supervision and retention of its employees. See Doe v. Coe, 362 Ill. App. 3d 594, 600 (1st Dist. 2005). When an employer knows or should know that an employee is unfit for a

position involving contact with others, the employer has a duty to take reasonable action to protect those who may be harmed.

99. The University knew or should have known that Alivisatos posed a risk of sexual misconduct. Despite this knowledge, the University failed to take reasonable supervisory measures to prevent him from abusing his position of power, failed to implement policies to protect students and employees from predatory conduct by senior officials, and retained Alivisatos in his position even after receiving reports of his misconduct.

100. The University's negligent supervision and retention of Alivisatos was a proximate cause of the sexual assault and the ongoing harm to Plaintiff.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jane Doe respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

A. Compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, including damages for physical injury, emotional distress, pain and suffering, loss of educational opportunities, loss of career opportunities, loss of earning capacity, and all other consequential damages;

B. Punitive damages against Defendant Alivisatos in his individual capacity, and against the University, in an amount sufficient to punish and deter the outrageous conduct alleged herein, because Defendants' conduct was willful, wanton, reckless, malicious, and in deliberate disregard of Plaintiff's rights. Under Alexander v. Riga, 208 F.3d 419, 430 (3d Cir. 2000), punitive damages are appropriate where the defendant's conduct is motivated by evil motive or intent, or involves reckless or callous indifference to the federally protected rights of others;

C. Injunctive relief requiring Defendants to: (1) implement comprehensive reforms to their Title IX policies and procedures to ensure prompt, thorough, and impartial investigations of sexual assault and harassment complaints; (2) establish independent oversight of the Title IX office; (3) provide mandatory training for all University officials and employees on sexual assault prevention and response; (4) implement policies to protect students and employees from retaliation for reporting sexual misconduct; (5) cease and desist from permitting Satanic rituals, prayers, and the activities of Satanic preachers on University premises and at University-sponsored events to the extent they contribute to a hostile environment;

D. Declaratory relief pursuant to 28 U.S.C. § 2201, declaring that Defendants' conduct violated Title IX, Title VII, Section 1983, and the IHRA;

E. An order requiring Defendants to pay Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), which provides for the award of attorney's fees to prevailing parties in civil rights actions, and pursuant to the provisions of Title IX and Title VII;

F. Pre-judgment and post-judgment interest as provided by law;

G. A trial by jury on all issues so triable, as demanded below;

H. Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable in this action, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## REQUEST FOR APPOINTMENT OF COUNSEL

Pursuant to 28 U.S.C. § 1915(e)(1), Plaintiff respectfully requests that this Court appoint counsel to represent her in this action. Plaintiff is a victim of sexual assault who is unable to afford counsel, and the legal and factual issues in this case are complex, involving multiple federal and state statutes, constitutional claims, and the need to conduct extensive discovery against a well-resourced institutional defendant. The appointment of counsel is necessary to ensure that Plaintiff's claims are adequately presented and that she has a meaningful opportunity to be heard. Under Pruitt v. Mote, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc), the court should consider: (1) whether the plaintiff has made a reasonable attempt to obtain counsel; and (2) whether, given the difficulty of the case, the plaintiff appears competent to litigate it without counsel. Both factors weigh in favor of appointment here.

## APPLICATION TO PROCEED IN FORMA PAUPERIS

Pursuant to 28 U.S.C. § 1915(a)(1), Plaintiff respectfully submits this application to proceed in forma pauperis (without prepayment of fees and costs) and requests that the Court grant this application. Plaintiff is unable to pay the costs of this action or give security therefor because of her poverty. Plaintiff may file a separate Affidavit; if required in Support of Application to Proceed in Forma Pauperis, together with a certified copy of her trust fund account statement (or equivalent financial documentation) for the six-month

19

period immediately preceding the filing of this Complaint, as required by 28 U.S.C. § 1915(a)(2).

Plaintiff's financial circumstances are such that she cannot afford to pay the $405.00 filing fee for a civil action in federal court. Plaintiff's income is insufficient to meet basic living expenses, and the payment of the filing fee would constitute a significant hardship. Under 28 U.S.C. § 1915(a)(1), "any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor."

By
Jane Doe, Plaintiff
Pro Se
2215 W Broadway
Anaheim, California(CA), 92804
Phone: 209-224-9076


Dated:  June, 1, 2026


## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth above, a true and correct copy of the foregoing Complaint was served upon COURT by email, in accordance with the Federal Rules of Civil Procedure.

Jane Doe, Plaintiff
June 1 2026

20